Good morning, Your Honors. Eric Slepian on behalf of Debra Stewart. I'm going to attempt to save three minutes for rebuttal. This is a Social Security claim with Ms. Stewart filing for her benefits in 2006, ultimately resulting in a denial in 2008. The issues that we're bringing before you are the ALJ's treatment of the weighing of subjective complaints as well as the weighing of medical evidence and the opinions of treating physicians. I'm going to try to address my arguments in those orders. First, the record shows that Ms. Stewart has had a lot of pain due to fibromyalgia. The Administrative Law Judge found the fibromyalgia to be severe. She also noted that the claimant was obese and had carpal tunnel syndrome surgery. No doctor has indicated that her symptoms are exaggerated or that she's malingering. Each of the doctors have prescribed treatment that are very consistent with her complaints of pain. And the Administrative Law Judge opted to find her not credible to the extent limitations are inconsistent with a light residual functional capacity, also with additional limitations set forth in Exhibit 19F. That statement has very little meaning to us. She doesn't identify which limitations in 19F she's accepting or rejecting. 19F is a medium residual functional capacity assessment with very minimal limitations in the hand. And she doesn't say really why she's rejecting these complaints that she's making. She does say that the claimant drives three times a week, she's able to clean her room, and she lives with her son and their children. Case law tells us that if you drive three times a week, and she notes it's only short distances, or if you can clean a room, and she notes she cleans her room, but not the rest of the house, and she doesn't vacuum, that's not evidence of any activity that would transfer to the grueling work pace. And if you look at cases like Redick v. Chader, Oren v. Astro, Galant v. Heckler, they all tell us the same thing. These type of activities are not indicative of a lack of disability. And Ms. Stewart freely says that's what she does. She spends a lot of time resting and she watches a lot of TV. DOJ also found that she wasn't, that she was more active, I guess, than she says, because she lives with her son, her son's wife, and their three children. I didn't understand that reasoning at all. Does that mean she's got to live alone to be disabled, or she has to live with more people or less people? I thought there was some inconsistency on that point. The self-reporting form was not She does not do child care. Those three children are in school. Their ages were 18, 16, and 9, I believe. Well, I guess, but the question is, isn't there an inconsistency between what she reported on her form versus what she said to the ALJ at the hearing? No. What the administrative law judge questioned the claimant about was one of the consulting physicians. It might have been a treating physician. I'm not sure who said it. But they said that you live alone. Mr. Slapien, let me refer you to ER 294. It looks like the Valley Neurology Associates consult. She does her bills at home, does all ADLs, and lives alone. Right. And the administrative law judge asked her about that, and she said simply, it's not true. I've never lived alone. We don't know where that information came from. There's nothing to do with that report. It appears only once in this entire record. But doesn't it appear in the history that she provided to the consulting doctor? I guess it was Dr. Reynolds on July 22nd of 2008? Dr. Reynolds does write that, and she was asked about it, and it's just simply an error. There is no evidence in what the doctor wrote in his report or an inconsistency in what she told the doctor on July 22nd versus what she said under oath. That's the issue, is it not? And there's no way for us to actually know what she told that doctor. But every other record, every other indication is it was simply wrong, the doctor was incorrect, and she testified to it. And if the record is an inconsistency in that, she should have really addressed it, instead of just saying one record says that you live alone, so I'm not going to ---- How about the ---- What more addressing do you want? Let her develop the record. Let her see where she was living, who else was living there. I mean, you could provide bills and things like that. This lady hasn't worked in many years. She's lived with her family members. There is no income at all. This is a claim for supplemental security income, which means that her total assets are less than $3,000, and she has no income. There is no way this lady was living on her own. She would have been eligible for public housing and those kind of things. We're not denying what the facts are or anything else. Nobody's questioning that, questioning why she said what she said. I have no reason to believe the doctor lied. Well, Your Honor, my response to that would be I don't believe that she said it, but I understand what the record says. And even if ---- And then you say and he, or I assume you meant the ALJ, should have developed it more. If she thought it was a substantial credibility issue. And that's a key factor here. Because the ALJ has the duty to develop, you know. Yes. In fact, the case law, off the top of my head, I think it's Delorme, but I'm not sure of the site. An ALJ has a very high duty to develop the record, even if a claimant is represented. And I had no idea that the administrative law judge was going to find this to be a credibility issue. And on top of that, it's on an issue that has nothing to do with disability. It's just not even relevant to what the entire facts are. I think another inconsistency, which I think is probably more significant for disability purposes, the ALJ noted that she testified that her hand was worse off after the surgery, but that's not what she told her doctor after the surgery, and he made a note of that in the post-op examination. Right. So let's take a look at those particular records. She had her surgery in 2007. Initially she reports there was some improvements, and then six weeks later, six weeks, she says my pain has come back. And then the doctor goes through it, and what the doctor writes is she has some improvement in the hand, but she's still complaining of numbness and pain in her wrist. And then she continues to complain at other office visits. And if you look at the record the judge cited, which it's quite confusing what she did, she references, I think it's Exhibit 18F, page 8. Right. I'm looking at, it's ER 19 of the administrative law judge's opinion where he cites the first full paragraph there after careful consideration of the evidence. Right. Now, that record, I believe that record was in 2007, or maybe it was, I'm sorry, August or September of 08. But it says she still has pain. He cited to Dr. was it Flitman, Exhibit 22F, that there was no evidence of carpal tunnel syndrome in August 2008. That is what the doctor, what the judge writes. But if you look at the record, there is no treatment record from Dr. Flitman in August of 2008. We noted that in our brief, and we also note that there is one in March of 09 at the place that she cites. So we don't know if she just made an error or what actual document she was looking at. But what the judge says is there is no medical examination, there is no reactivation of carpal tunnel syndrome. He does not say that she does not have wrist pain. I'm still trying to understand where the ALJ erred here. I want to make sure I understand your point, which is, are you saying that she was not examined in August of 2008 by Dr. Flitman, or there is nothing in Exhibit 22F that corroborates the error in pain? She was not examined by Dr. Flitman in August of 2008. Okay. And do you know when Dr. Flitman examined her? Both before and after that date, I believe. But the citation that she gave, she gave an exhibit number and a page number, matches up with a record dated March of 2009. Correct. Well, that's not helpful, is it? If it's even later? It's later. But the doctor doesn't say that she's denying wrist pain. The doctor says that the carpal tunnel syndrome has not been reactivated. And that's a significant difference, because if you look at what the other doctors Wait. I'm not sure I understand what you just said. Okay. Has not been reactivated. In other words, it hasn't recurred, right? Isn't that what reactivated means? No. Dr. Flitman, the neurologist, has indicated that there's a negative Fallon sign and a negative Talon sign. So I think that's the name of it. So that means that on examination, he's not feeling it. It doesn't mean that she doesn't have wrist pain. She complains of wrist pain and wrist swelling to her other doctors, and the doctors all say that this may be a factor of fibromyalgia. It may not be a factor of carpal tunnel syndrome. And, you know, she's not there to differentiate whether her pain is due to carpal tunnel syndrome or fibromyalgia. She's there to say my pain is here. The question, I guess, for us on appeal, then, is whether or not this constitutes substantial evidence sufficient to support the credibility determination by the administrative law judge. And I guess your position has to be that because of the errors that you claim, no reasonable adjudicator could have reached those conclusions. Yes, Your Honor. Okay. And I would just like to add that the records after that show that she continues to complain of this pain. So we're left with a situation where it doesn't mean you're not believable. In fact, her nerve conduction study is positive for right mononeuropathy in the wrist. And so there's supporting evidence to explain this. And she has the fibromyalgia. Do you want to save three minutes for rebuttal? Yes, Your Honor. Thank you. I appreciate that. I'd like to get to the treating physician. Okay. Good morning, Your Honors. My name is Mike Thomas, and I represent the Social Security Administration in this matter. May it please the Court. In the Commissioner's view, this case is about three issues. First is whether the ALJ properly evaluated the opinion of Dr. Mahadov and Ms. Stewart's treating physician. Second, whether the ALJ properly evaluated Ms. Stewart's subjective complaints. And third, if the Court can't affirm the ALJ's decision on the merits, whether it should remand the case for further proceedings or apply the credit as true in reverse for an award of benefits. I'm sorry. I didn't understand what you said. Yeah, yeah. The acoustics in this room are not good, so just pull it down. Okay. I'm sorry, Your Honors. So three issues. First, whether the ALJ properly evaluated Ms. Stewart's treating physician's opinion. Second, whether the ALJ properly evaluated Ms. Stewart's credibility. And third, if the Court can't affirm the ALJ's decision on the merits, whether it should remand for further proceedings or reverse for payment of benefits under the credit as true rule. It's the Commissioner's position that the ALJ reasonably evaluated the medical source opinion of Dr. Mahadov. And Dr. Mahadov's opinion was contradicted by other physicians in this record. And so the ALJ was only required to apply specific or give specific and legitimate reasons for why he was discounting that opinion. We have cases that would require clear and convincing as the standard. Correct, Your Honor. Then why don't you mean, I understand you've made an attack on that. Indeed, we have a theme today with regard to that rule and with regard to credit as true. We're a three-judge panel. Right. Bound by precedent set by other three-judge panels. How can we disregard the precedent that establishes clear and convincing as the standard? Well, the Commissioner's not asking that you disregard that. Then maybe you'd better acknowledge the standard is the one that you have to overcome. Well, yeah, where a treating physician or an examining physician's opinion is uncontradicted by other physician opinion evidence, then, yes, the clear and convincing standard applies. Here we're saying that it doesn't because you've got other physicians' opinions that contradict that. And those include Drs. McPhee, Dr. Sosinski, and the state agency physicians, Drs. Griffith and Hopkins. Your Honor, your Honors, Dr. Mahatogun's opinions weren't consistent with his own treatment notes. And this is borne out by the fact that despite saying that Ms. Stewart could stand or walk for only short periods and lift less than 10 pounds, he found that she had normal gait and grossly intact strength. And that's in the excerpts. How is that inconsistent? Normal gait? You can walk. You just can't walk very far. Well, Your Honor, I mean, I understand gait to mean how you're walking. I don't understand that that speaks to the question of endurance. It may be that somebody's weak will walk with a limp, but maybe not. All right. Give me a moment here. I'll go ahead and say I went through the medical records, and throughout his notes, there are regular references to the joint pain, to the conditions which she describes, so that she may have had a normal gait. She may have had some days better than others. But is there really anything in his notations, his records, that are so contradictory? Well, Your Honor, you know, Ms. Stewart testified at the hearing that she could only stand for 30 to 40 minutes before she needed to sit down. She could only walk for 40 minutes, only sit for 40 minutes, and lift a gallon of milk. Well, the question you were discussing was the basis for rejecting the treating physician's testimony or recommendation or findings. Her testimony, are you saying that's what contradicts Dr. the name I can't pronounce? Mahatovin. Mahatovin. Well, Your Honor. What contradicts? That's the question you put before us. What is it that contradicts his opinion such that the ALJ properly rejected it? Well, I mean, Dr. Mahatovin gave, you know, very stringent functional limitations. He rendered two opinions. In one, I think he said that she could only stand and walk for less than two hours in an eight-hour workday, and in the other one, he said that she could only stand and walk for one. But a normal gait, I mean, she can walk. Well, wait a minute. He doesn't say she can't walk. He says she can't do it for more than one or two hours. Normal gait, how is that inconsistent? It's our position that normal gait indicates that a person can walk. But for how long? I walk with a normal gait, but I've got arthritis. You don't find me walking eight hours in a row all that often. How does normal gait contradict the durational limitation on her ability to walk? Because I've got to tell you, I don't see it. Okay. Well, then I would just point to his findings of intact strength in her arms and legs. And how does that speak to duration? I don't know that it necessarily speaks to duration. What you're trying to contradict, he didn't say she couldn't walk, she couldn't stand. He put a durational limitation on it, a durational limitation that's important under the grids, under vocational experiment. That's what drives the sedentary light and so forth. And you're telling me that for a period of time she can walk, for a period of time she has strength, but none of that seems to speak to the durational limitation. So I'm having trouble figuring out what exactly is contradictory in his own records to the opinion he offered up. Well, you know, I agree that, you know, the objective medical findings in his records may not speak to duration, but they don't, those notes don't assign her any specific functional limitations. And so it seems like the notes don't line up with the opinion. Well, I go see my rheumatologist every three months or so, and I doubt that his notes would assign those functional limitations going on because that's not what's at issue each time I go see him. That doesn't mean, and I'm not claiming to be disabled. I think I could stand and walk and so forth long enough. Fortunately, my condition's better than hers appears to be. But the fact that the doctor doesn't speak in those kind of terms in his normal notes doesn't seem to me to be remarkable and by itself doesn't represent a contradiction to a conclusion that she's incapable of the kind of duration that we're talking about. So the question again becomes he's a treating physician. What is the evidence that's specific, legitimate, possibly clear and convincing that justifies the ALJ's rejection of his opinion? I'm still waiting to find out what it is. Okay, well, I'll attempt. You can try again. Otherwise, we'll find another issue. Well, I would say that Dr. Mohodovan's opinions, I mean, they were inconsistent with the findings and the opinions of the examining physicians in this record. I would point the Court to specifically to the findings and opinions of Dr. McPhee. Dr. McPhee said that there was no objective reason that she couldn't work, that she couldn't stand. Or couldn't lift 25 pounds, 50 pounds. Said that she could walk, bend, squat, hop, take her shoes off, rise from a seated position. Also, duration, and if so, what's the basis of this conclusion with regard to duration? Because, again, we're talking about not what she can do at one moment, but what she can do in an eight-hour day. Well, Your Honor, Dr. McPhee examined her and presumably based the limitations he assigned on that examination. And the same is true of Dr. Sosinski, who later on in the time period, in February of 2009, found that she had some pain to different parts of her body, full strength, intact sensation, and normal coordination and gait. And Dr. Mahadevan's opinions were inconsistent with the imaging studies in the record. One of the things that comes through is her complaints of back pain. And there are imaging studies that show only mild findings. Next, I'd like to address Ms. Stewart's credibility, if I could. And here, her subjective complaints weren't consistent with the findings of Drs. McPhee, Hopkins, Griffith, or Sosinski. And they weren't consistent with the benign objective medical findings in the record. Finding that she, for example, regarding her carpal tunnel syndrome, in October of 2008 at the hearing, she said that she had numbness in her hands, she wore a splint on her wrist, had left carpal tunnel syndrome, and dropped things, and her hands were weak. Dr. Wilson found that she had full finger motions in October of 2007, and in December of 2007 found that she had only minimal wrist tenderness. In 2009, Dr. Flipman found no evidence of reactivation of left carpal tunnel syndrome. At the hearing, she said that she could stand for 30 to 40 minutes, that walking hurt her back. She could only walk for 40 minutes, and she could only sit for 40 minutes. But X-rays of her back showed, at worst, only mild findings or mild abnormalities. The fact that she had fibromyalgia didn't preclude the ALJ from considering objective medical evidence and evaluating her credibility. Well, I mean, that's always the problem with fibromyalgia. Right. Because it's not inconsistent, but you can have both at the same time. You can have what appears to be an X-ray with mild or even, I guess, no objective evidence of distress, at the same time the patient reports and medical science confirms you can experience considerable pain. That's why these cases are always a challenge. Right. But the commissioners, I mean, the statute itself and the regulations state that objective medical evidence is always an issue in evaluating credibility. And, you know, we acknowledge that there is case law, you know, that talks about this. There's a case, a Ninth Circuit case, the Rollins case, which we cite in our brief, which was a fibromyalgia case, where the court, you know, considered that the ALJ properly evaluated the objective medical evidence and finding the claimant not credible. And Sarchay v. Chater, the Seventh Circuit case, talks about fibromyalgia and notes that it's not ordinarily a disabling impairment. So the fact that someone has fibromyalgia doesn't automatically, isn't, you know, per se, doesn't mean that they're per se disabled. And, you know, here we want to emphasize that the ALJ didn't question that Ms. Stewart had fibromyalgia and the objective medical evidence suggested that her pain and symptoms weren't as limiting as she alleged in October. Well, and that's the piece that's hard, because when I look at what the ALJ cites for rejecting the claimant's testimony, I don't see a lot there. I mean, the fact that she's not entirely bedridden and incapable of moving isn't the same as saying her complaints about, I can only do some things on a limited basis, aren't true. And so we cite that she lives with her son and their children. Frankly, I don't know where else she's supposed to live. She drives three days a week. That seems to be a pretty far cry from saying, I mean, what exactly is inconsistent with that? For her own reports. Well, Your Honor, I say I have a minute 55 on the clock. Well, you know, I would point the court to the inconsistencies in the statements that she made about her wrist surgery. I think that's important here. I think that shows that there is, it goes to the fact that she couldn't keep a straight story. Well, she may not have had the same condition every day. Well, what's telling here is in September of 2007, right after her surgery, she acknowledged that the pain she had before her surgery, particularly at night, was no longer there. Two months later, she said that her hand pain had not improved. But then in December of 2007, two months after that, she said that the only pain that she had was in her right hand and that these symptoms resolved after surgery on the left. So there seems like there's some going back and forth as to the efficacy of the treatment. So I would point the court to that. And I would also point the court to, I mean, the ALJ pointed to activities of daily living, which in her decision seem minimal. She also, but she also said, I mean, she said that she considered the entire record. And, I mean, there are other, you know, pieces of evidence regarding daily activities in this record that would undercut, I mean, that would support the ALJ's decision as far as... Can we reach out to those? Yes. I see that I have 18 seconds. Would you like me to sum up or do you want me to... Answer the question. I mean, it's a legal proposition. Aren't we limited to what the agency's findings and bases are? Are we entitled to review the record and determine for ourselves, well, there are all these other reasons that could have been cited but weren't? I mean, I'm not asking, I mean, frankly, I understand you're right. I go through here and I can find things that could have been cited as well that may have been more substantial, in my mind at least, than what the ALJ did cite. Are we entitled to look beyond the findings of the ALJ and say, well, maybe not for this, but these reasons are enough? Can we go outside like that? Well, I mean, we can engage in post hoc rationalization. I mean, but the fact is the ALJ said that she considered the activities of daily living. They're in the record, and so that's not post hoc rationalization. It shows that the ALJ considered the activities of daily living as a factor in evaluating Ms. Stewart's credibility. So with that, I would respectfully ask the Court to affirm the ALJ's decision. Thank you, Your Honors. Thank you very much. Ms. Leppi, you've got about three minutes left. Thank you, Your Honors. I'd like to point out, and I think you understand the issues, that here we have a treating rheumatologist. He's a specialist in fibromyalgia. His records are all consistent with his opinion, and they note Ms. Stewart's complaints of pain. The leading case on this, well, Mark Caldwell is sitting behind me. He argued it. I'm not going to say it's a leading case, but a very persuasive case is the Beneke case that was decided in 2004, and I would ask that Your Honors take a read of that decision. In addition to that, I do want to touch on the remedy that we're looking at. She filed for her benefits in 2006. She is now eight years into this. There is no evidence of exaggeration or malingering, and there is no question that if we accept either her stated complaints, the treating physician opinion, that there are no other issues that need to be resolved. The vocational expert consistently said those limitations would preclude sustained work, and this administrative law judge, she noted that at the hearing on benefits, stating if we credit the opinion of Dr. Mahatobin, then I understand that disability is established. So I would ask you to consider her acknowledgment as well. That's all I have, Your Honor. Okay. Thank you both very much for your argument. The case to target is submitted.
judges: Duffy, Tallman, Clifton